IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TEXARKANA DIVISION

| | | |
|---|---|---|
| **ELROY CHESTER,** | § | |
| Petitioner, | § | Civil Action No. 5:05cv29 |
| **NATHANIEL QUARTERMAN, DIRECTOR,** | § | |
| Texas Department of Criminal Justice, Institutional Division, | § | |
| Respondent. | § | |

**MEMORANDUM OPINION**

This matter comes before the Court on Petitioner Elroy Chester's amended application for a writ of *habeas corpus* (docket entry #19), filed on June 5, 2007. The Court, having considered the circumstances alleged and authorities cited by the parties, as well as the record and the applicable law, finds that the application is not well-taken and it will be denied.

**Introduction**

Chester was convicted of capital murder and sentenced to death. After completing his direct appeal and his first round of state and federal post-conviction review, he filed a second petition for post-conviction relief in state court, contending that his execution would violate the Eighth Amendment's ban against cruel and unusual punishment because he is mentally retarded. The Texas Court of Criminal Appeals found that Chester was not mentally retarded and denied relief. Chester then filed an application for a writ of *habeas corpus* in this Court. 28 U.S.C. § 2254 (d) (1) provides that a federal district court cannot grant relief in *habeas corpus* a claim adjudicated on the merits by

the state court unless that court's adjudication of the claim is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. In the present case, the law forbidding the execution of the mentally retarded was established by the Supreme Court of the United States in *Atkins v. Virginia*, 536 U.S. 304 (2002).

In *Atkins*, the Court held that there was a national consensus that because of their mental impairments, the personal culpability of the mentally retarded for their crimes is diminished. Among those impairments are diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. The mentally retarded often act on impulse rather than pursuant to a premeditated plan, and in group settings they are followers, rather than leaders. The Court noted that not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus that they should not be executed, and left to the states the task of developing appropriate ways to enforce the constitutional restriction upon executing mentally retarded offenders. *Atkins*, 536 U.S. at 317-318.

In *Ex parte Briseno*, 135 S.W.3d 1 ( Tex. Crim. App. 2004), the Texas Court of Criminal Appeals held that the determination of whether a capital offender was mentally retarded was to be made by applying the definitions of mental retardation stated by the American Association of Mental Retardation ("AAMR") and the Texas Health and Safety Code. Those definitions are very similar: they both require significant limitations in both intellectual functioning and related adaptive behavior, originating before the individual was 18 years of age. The court also stated, however, that the adaptive behavior criteria in the two definitions were so subjective that in virtually every

instance, a prosecution expert could opine that an observed behavior was symptomatic of a personality disorder, while a defense expert could testify that the behavior was related to the offender's sub-average intellectual functioning. Moreover, the court also seemed to hold that the fact that an offender meets the AAMR and Texas Health Code definitions for mental retardation does not necessarily mean that the offender is so impaired that executing them would constitute cruel and unusual punishment. In light of these two holdings, the court suggested that the fact-finder in a mental retardation hearing might choose to focus upon seven evidentiary factors in determining (a) whether to credit the prosecution's or the defense's explanation for the nature of the offender's adaptive behavior limitations, and accordingly (b) whether the offender is "mentally retarded for purposes of the Eighth Amendment," *i.e.*, sufficiently impaired that he falls within the group of mentally retarded offenders for whom there is a national consensus that they may not be executed.

The seven evidentiary factors are:

1. Did the people who knew the offender during his developmental period think he was mentally retarded?

2. Has the offender formulated plans and carried them through or is his conduct impulsive?

3. Does his conduct show leadership or does it show that he is led around by others?

4. Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

5. Does he respond coherently, rationally and on point to oral and written questions or do his responses wander from subject to subject?

6. Can the person hide facts or lie effectively in his own or other's interests?

7. Did the commission of the capital offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 7-9.

In the present case, the state court found, and the Director does not now dispute, that Chester suffers from significantly sub-average intellectual functioning. The state court also found that in October of 1987 Chester obtained a score of 57 on the Vineland Adaptive Behavior Survey, an accepted instrument for measuring limitations in adaptive behavior, and that this score indicated that his limitations were significant. The state court found that although this evidence that Chester was mentally retarded was "persuasive," it could not overturn the trial court's findings that Chester's adaptive behavior deficits were related to factors other than his sub-average intellectual functioning, because that court's findings were based upon the *Briseno* evidentiary factors and they were supported by the record.

**Facts** [1]

On the night of February 6, 1998, Erin DeLeon, age seventeen at the time, was home alone with her one-year-old son Tony. Erin and Tony lived in the home of Erin's mother, KimRyman DeLeon, along with Erin's sisters Claire and Sasha. After putting Tony to bed, Erin spoke briefly on the phone with her boyfriend, and then began watching a movie in the living room.

Unbeknownst to Erin, [Chester} was outside the house, watching her. He had been walking through her neighborhood, searching for a place to burglarize. He had with him a pair of gloves, a knitted hat in which he had cut two holes to make a ski mask, and a gun which he had stolen in a previous burglary. He had scratched the serial numbers off of the gun. Upon reaching the Ryman home, he recognized it as one he had burglarized previously. He watched Erin through the open window blinds and, when it appeared that she was home alone, he went around the side of the house and cut the phone lines, which he later said was his normal practice when committing a burglary. He checked the side door to the house and found it unlocked. [He] put on his mask and gloves, and entered the house through the side door. That door opened into the kitchen, which he entered, and then came into the living room where Erin was.

[Chester] grabbed Erin by the hair, held the gun to her head, and demanded money or jewelry. Erin replied that she had a little jewelry, but no money, in the house. [Chester] then took her through the house, still holding her by the hair, searching her mother's and sisters' bedrooms to confirm that no one else was at home. He asked Erin where her mother was and if she was coming home. Erin said her mother would be home in the morning. He then asked Erin who she had been

---

[1] This is quoted from *Ex parte Elroy Chester*, No. 75,037 Slip Op. (Tex. Crim. App. February 28, 2007).

on the phone with earlier. Erin replied that she had spoken with her boyfriend.

[Chester] then took Erin into her mother's bedroom, from which he took some jewelry. He then did the same in her sisters' and in Erin's own bedroom. He took her to the dining room, and then had her turn off all remaining lights in the home. He then took her into the garage, still pulling her by the hair.

Once in the garage, Erin offered to turn on the lights but [Chester] refused. Instead, he began feeling around in the dark until he found a roll of duct tape. Erin later testified that she believed by the way he was feeling around that he knew exactly what he was looking for in the dark garage.

As they re-entered the house, Erin's sister Claire was arriving at the side door with her boyfriend Tim. They attempted to enter through the side door but [Chester] had made Erin lock it, so Claire knocked on the door. [Chester] pulled Erin by her hair toward the door and, while hiding behind her with his gun pointed at her head, ordered Erin to unlock the door and let her sister into the house. When Claire entered the house, [Chester] pushed Erin forward and yelled at Claire not to say anything or he would "blow her [Erin's] head off." Claire began to babble incoherently and Erin tried to quiet her.

Tim, still unaware of what was happening, was still outside on the porch and asked Claire what was wrong. [Chester] ordered Claire to tell Tim that nothing was wrong and that he should leave. Claire complied, but Tim persisted, and the applicant then told him directly to come into the house. Tim's car was still running, so he asked [Chester] if he could turn it off first, and Chester said yes, but if Tim attempted to leave that he would kill both girls. Tim went to turn off his car ignition, and then entered the house.

Once inside, [Chester], still holding Erin by her ponytail and with the gun pointed at her head, demanded jewelry or money from Claire and Tim. They said they had none - Tim showed the applicant his empty wallet, and Claire went to the her mother's bedroom to confirm that there was no more jewelry in the house. When Claire returned, the applicant asked Tim what kind of car he had, and specifically whether it was an automatic or a stick shift. Erin later testified that she presumed from those questions that [Chester] was thinking of using Tim's car to escape. [Chester] then ordered Tim and Claire into the bathroom.

Alone with Erin in the dining room, [Chester] ordered her to remove her clothes. Erin began to do so. [Chester] tried to remove her bra himself, and did remove her underwear himself. Erin was now kneeling and wearing only her socks, and [Chester] used the duct tape to blindfold her. [Chester] then called for Tim to come out of the bathroom. He ordered Tim to strip, and Tim removed all of his clothes except for his underwear and socks. [Chester] then used the duct tape to blindfold Tim, and to bind his wrists and ankles. After that, [Chester] dragged Tim into Erin's bedroom.

[Chester] returned to the living room and ordered Claire to come out of the bathroom. He ordered Claire to remove her clothes, and she complied. He then blindfolded Claire with the duct

5

tape, and seated her on the floor next to Erin.  Erin then removed the tape over her eyes enough to see [Chester] unzipping his pants and removing his mask, but he came over to push the tape back down over her eyes.

[Chester] then raped Erin vaginally, on the floor, next to her sister.  When he was done and had removed himself from on top of her, Erin tried to get up, but [Chester] pulled her over to where he was now sitting in a chair, and forced her to perform oral sex on him. [Chester] kept the gun next to Erin's forehead and threatened to shoot her if she tried to bite him.  After the oral sex, Erin moved to the floor area at one side of the room, and [Chester] ordered Claire to perform oral sex on him, which she did.  He repeated the same threat that he would shoot her if she bit him.

At this point, a car approached the house. [Chester] heard the car, ran into the kitchen to dress himself, and went to stand by the side door to wait for the person approaching, who turned out to be Willie ("Billy") Ryman, Kim Ryman's brother and the girls' uncle.  Billy would often come to the house to check on the girls, when he knew their mother was at work.  Billy opened the door and turned on the light. [Chester] yelled at him to come inside, and, upon entering, he shot him.  Billy fell to the ground immediately, and [Chester] dragged his body into th kitchen, where Billy eventually died. [Chester then ran out of the house.  Claire got up and locked the side door, locking him out of the house.

Billy's girlfriend Marcia Sharp had been waiting outside in Billy's truck in the driveway while he went up to the house.  Marcia heard the gunshot fired at Billy but thought perhaps it was a car backfiring.  Moments later, she saw [Chester] run out of the house and then try to go back in, after realizing that he had been locked out by Claire. [Chester] then approached the truck on the passenger side, where Marcia was sitting.  The door was unlocked but, just as he reached for the handle, Marcia locked it. [Chester] was now wearing his mask again.  He pulled out his gun and shot once at the lock on the car door.  He then noticed that the driver's door was unlocked, so he ran around to the driver's side of the truck, but Marcia quickly reached over and locked that door, too. [Chester] shot twice at the lock on the driver's door, but it did not open.  He then stepped back, looked at Marcia, and shot twice more at the driver's door window.  None of the gunshots hit Marcia.  He then ran down the street, away from the house.  The events at the Ryan DeLeon home were the culmination of a six-month spree of criminal activity by [Chester], in which he burglarized at least five residences, sexually assaulted two people, murdered at least five people, and fired shots at no fewer than five others . . .

The Port Arthur police arrested [Chester].  While in custody, and after being asked to provide a blood sample, [Chester] told investigator Timothy Smith that he would take him to where the gun that was used in the crime was located. [Chester] knew Smith and seemed to trust him more than he did the other officers.  Smith, two investigators from the District Attorney's office, and two local detectives then accompanied [Chester] to his father's house. [Chester] was wearing a jail jumpsuit, as well as leg restraints attached by a chain to another chain around his waist, which in turn connected to a pair of handcuffs, thereby shackling his wrists to his waist, such that his mobility was extremely limited.

6

Upon reaching his father's house, [Chester] attempted to move ahead of the others. Smith had admonished him that he would not be allowed to handle or touch the gun himself, but [Chester] insisted that he would have to locate the gun personally because it was in a place that was difficult to reach. [Chester] assured Smith that the gun was unloaded, and that he himself was the only one who would be able to reach it.

[Chester] led the others to his bedroom and, despite efforts to prevent him from moving ahead too quickly, walked over near his bed and dragged a small night stand to a position directly underneath a hole in the ceiling. He then began to climb on top of the night stand, but was quickly told to stop. One of the investigators, Rose, then climbed on top of the night stand to look in the hole, and [Chester] directed him to look in a specific direction for the gun. Rose looked and reached around inside the hole as directed by [Chester] but could not find the gun. [Chester] then climbed atop the same night stand where Rose was standing and, while continuing to direct Rose to look in the same direction he had previously indicated, attempted to reach with his shackled hands in the opposite direction from where he had told Rose to look.

Smith had been watching [Chester] the entire time and, when he saw him reach with his hands in the opposite direction, drew his gun and ordered [Chester] to stop moving. [Chester] was taken down from the night stand and escorted to sit on a nearby couch. Smith then climbed atop the night stand himself and looked in the direction where the applicant had attempted to reach. He immediately saw the gun and retrieved it. The gun was fully loaded.

**Standard of Review**

Title 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court determination that is objectively unreasonable meets the requirements of § 2254(d)(1). *See Woodford v. Visciotti*, 537 U.S. 19, 27 (2002). Pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), while pure questions of fact are reviewed under § 2254(d)(2). *See Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000), *cert. denied*, 532 U.S.

949 (2001). Factual findings made by the state court are accepted unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

**Claims**

Chester contends that the state court's use of the *Briseno* evidentiary factors to decide his case was an unreasonable application of the federal law as clearly established by the Supreme Court of the United States in *Atkins v. Virginia.* He also takes issue with each of the individual evidentiary factors.

Regarding the first evidentiary factor, Chester argues that the state court's determination - that the people who knew him during his developmental period did not think that he was mentally retarded - was unreasonable in light of the evidence presented in state court proceedings, and in addition, he contends that that factor is invalid because lay persons are not able to accurately diagnose mild mental retardation. Regarding the second evidentiary factor, Chester agrees with the state court's determination that he is capable of some planning, particularly regarding his criminal conduct, but contends that the evidentiary factor is invalid because mentally retarded individuals are capable of some planning and are able to carry out some plans. As to the third, fourth and fifth evidentiary factors, Chester contends that the state court's determinations - that his conduct showed that he was a leader, not a follower; that his conduct in response to external stimuli is rational and appropriate, and that he responds coherently, rationally and on point to oral and written questions - were all unreasonable in light of the evidence presented in the state court proceedings, and he also contends that the fourth and fifth factors are invalid because mentally retarded individuals are often able to respond rationally and appropriately to external stimuli and to written and oral questions. As to the sixth evidentiary factor, Chester does not take issue with the state court's finding that he can

hide facts and lie effectively in his own interests, but he again contends that the factor is invalid because mentally retarded individuals are also capable of doing so. As to the seventh and final evidentiary factor, Chester does not take issue with the state court's determination - that the commission of his capital offense required forethought, planning, and complex execution of purpose, but he contends that that factor requires him to show a nexus between his mental retardation and the commission of his capital offense, which is directly contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Tennard v. Dretke,* 542 U.S. 274 (2004).

**Analysis**

Chester's first argument, that the state court's using the *Briseno* evidentiary factors to decide his case was contrary to, or the result of an unreasonable application of the federal law as clearly established by the Supreme Court of the United States in *Atkins v. Virginia* is foreclosed by *Woods v. Quarterman,* 493 F.3d 580, 587 n. 6. (5th Cir. 2007), in which the United States Court of Appeals for the Fifth Circuit found "nothing in *Briseno* that is inconsistent with *Atkins*."

Chester's argument that the seventh and final *Briseno* evidentiary factor is contrary to or the result of an unreasonable application of federal law as clearly established by the Supreme Court of the United States in *Tennard v. Dretke* is without merit. In *Tennard,* the Supreme Court held that it was unconstitutional for Texas to require a defendant in a capital case to show a nexus between his criminal conduct and the circumstances offered as mitigating for the evidence of those circumstances to be admissible. Chester points out that the final *Briseno* evidentiary factor concerns the circumstances of the crime, and he argues that he would have been considered mentally retarded if not for that factor. Accordingly, he contends that *Briseno* requires him to show a connection

between his mental retardation and the circumstances of the offense, which is specifically prohibited by *Tennard.*

The Court does not read *Tennard* so broadly. That case addressed only the admissibility of mitigating evidence. In the present case, as in *Briseno*, the state court admitted the applicant's evidence of his adaptive deficits, but found that evidence that he was not impaired ( his conduct in planning and committing the crime) outweighed the evidence of adaptive deficits.[2] Because the holding in *Tennard* addressed only the admissibility, not the weight, of mitigating evidence in the capital case context, the state court's use of the final *Briseno* evidentiary factor as a basis for finding that Chester was not mentally retarded was neither contrary to, nor an unreasonable application of, the holding in *Tennard*.

The Court finds it unnecessary to address Chester's arguments as to the other six evidentiary factors, because we agree with our sister court in the Western District of Texas in that an affirmative finding as to the seventh and final *Briseno* evidentiary factor is sufficient by itself to uphold a denial of relief in a *habeas corpus* proceeding. In *Moreno v. Dretke,* 362 F.Supp.2d 773 (WDTX 2005), *aff'd,* 450 F.2d 158 (5th Cir. 2006), *cert. denied*, ___ U.S. ___, 127 S.Ct. 935 (2007), that court stated: "Given . . . petitioner's demonstrated capabilities to engage in the planning and execution of complex schemes . . .[the state] court's rejection on the merits of petitioner's *Atkins* claim was neither an unreasonable application of clearly established federal law, as determined by the Supreme

---

[2] *In Gallo v. State,* 239 S.W.3d 757, 776-777 ( Tex. Crim. App. 2007), the Texas Court of Criminal Appeals stated: Recognizing that the adaptive behavior criteria are "exceedingly subjective," we set out some additional factors that fact finders might also focus upon in weighing evidence as indicative of mental retardation. Although these factors in-corporate lay-witness testimony, they do not exclude or downplay the importance of expert testimony or other evidence. . . The ultimate issue of whether a defendant is mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon *all* of the evidence and determinations of credibility. (emphasis in original)

Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 362 F.Supp.2d at 792. As stated above, in the present case Chester does not take issue with the state trial court's finding that the commission of his capital offense required forethought, planning, and complex execution of purpose. Accordingly, that court's rejection of his mental retardation claim is neither inconsistent with, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Atkins v. Virginia* and *Tennard v. Dretke*.

**Conclusion**

For the above reasons the Court will deny Chester's application for a writ of *habeas corpus*. An order and judgment will be entered.

**SIGNED this 28th day of April, 2008.**

_____
DAVID FOLSOM
UNITED STATES DISTRICT JUDGE

11